# Exhibit A

CALDWELL LESLIE & PROCTOR, PC
CHRISTOPHER G. CALDWELL, State Bar No. 106790
  *caldwell@caldwell-leslie.com*
MICHAEL D. ROTH, State Bar No. 217464
  *roth@caldwell-leslie.com*
ALBERT GIANG, State Bar No. 224332
  *giang@caldwell-leslie.com*
CAMERON J. JOHNSON, State Bar No. 266729
  *cjohnson@caldwell-leslie.com*
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017-5524
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Attorneys for Defendant LYFT, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CASEY LOEWEN and JONATHAN WRIGHT, individually, and on behalf of other members of the general public similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>LYFT, INC. a Delaware corporation, and DOES 1 through 100, inclusive,<br><br>        Defendant. | Case No. 15-CV-01159-EDL<br><br>**DEFENDANT LYFT, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL INDIVIDUAL ARBITRATION AND DISMISS ACTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Declarations of Sebastian Brannstrom and Eric Burdullis with Exhibits; and [Proposed] Order filed concurrently herewith]**<br><br>**Date:     June 9, 2015**<br>**Time:     9:00 a.m.**<br>**Crtrm.:  E**<br><br>Magistrate Judge Elizabeth D. Laporte<br><br>Trial Date:            None Set |

CALDWELL
LESLIE &
PROCTOR

1  **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2      **PLEASE TAKE NOTICE** that on June 9, 2015, at 9:00 a.m., or as soon thereafter as this

3  matter may be heard, in the courtroom of the Honorable Magistrate Judge Elizabeth D. Laporte,

4  located in Courtroom E of the United States Courthouse, 450 Golden Gate Avenue, San Francisco,

5  CA 94102, Defendant Lyft, Inc. ("Lyft") will and hereby does move this Court to compel

6  individual arbitration of Plaintiffs' claims and dismiss this action with prejudice, or, in the

7  alternative, to stay this action pending the completion of individual arbitration proceedings.

8      This Motion is made pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"),

9  upon the grounds that Plaintiffs Casey Loewen and Jonathan Wright each agreed to arbitrate their

10  claims when they agreed to be bound by the arbitration provisions in Lyft's Terms of Service.

11      This Motion is based on this Notice of Motion, the accompanying Memorandum of Points

12  and Authorities, the Declarations of Sebastian Brannstrom and Eric Burdullis and the exhibits

13  attached thereto filed concurrently herewith, all of the pleadings and other documents on file in

14  this case, all other matters of which the Court may take judicial notice, and any further argument

15  or evidence that may be received by the Court at the hearing.

16

17  DATED:  April 17, 2015            CALDWELL LESLIE & PROCTOR, PC

18                                   CHRISTOPHER G. CALDWELL
                                     MICHAEL D. ROTH

19                                   ALBERT GIANG
                                     CAMERON J. JOHNSON

20

21

22                                   By _____/s/_____

23                                        CHRISTOPHER G. CALDWELL
                                     Attorneys for Defendant LYFT, INC.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ................................................................................2

    A.  Background on the Lyft Platform and Service .............................................2

    B.  Lyft Drivers and Riders Are Required to Consent to Lyft's Terms of Service ........................................................................................................2

    C.  Both Plaintiffs Agreed to the Terms of Service, Including the Arbitration Clauses ......................................................................................4

    D.  The Promotion ...........................................................................................7

    E.  Plaintiffs Ignore the Arbitration Provisions and File this Action ...............8

III. PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE THEIR DISPUTE WITH LYFT ON AN INDIVIDUAL BASIS ..........................................................9

    A.  Lyft's Terms of Service Involve Interstate Commerce ...............................9

    B.  Plaintiffs Loewen and Wright Each Agreed to Arbitration When They Agreed to Lyft's Terms of Service ...........................................................10

        1.  Loewen consented to arbitration by agreeing to the 2013 TOS ..................11

        2.  Wright consented to arbitration by agreeing to the 2014 TOS ...................12

    C.  Plaintiffs' Claims Are Within the Scope of the Arbitration Clauses And Individual Arbitration Is Required ...........................................................14

        1.  Questions of arbitrability are treated differently under the 2013 TOS and the 2014 TOS ...................................................................................14

        2.  Under the 2013 TOS, Loewen's claims should be sent to individual arbitration ..............................................................................................15

            (a)  Loewen's claims fall within the scope of the 2013 TOS .................15

            (b)  The 2013 TOS requires Loewen to proceed with individual arbitration ...............................................................................16

        3.  Under the 2014 TOS, Wright's claims should be sent to individual arbitration ..............................................................................................18

            (a)  Wright's claims fall within the scope of the 2014 TOS .................19

            (b)  The 2014 TOS requires Wright to proceed with individual arbitration ...............................................................................22

IV.  CONCLUSION ...................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Exp. Co. v. Italian Colors Rest.*,
  133 S.Ct. 2304 (2013) ...............................................................................................22, 23

*AT&T Mobility LLC v. Concepcion*,
  131 S.Ct. 1740 (2011) ...................................................................................9, 10, 16, 22

*Athena Feminine Techs. Inc. v. Wilkes*,
  No. C 10-04868, 2011 WL 4079927 (N.D. Cal. Sept. 13, 2011)................................. 15-16, 20

*C.D. Anderson & Co. v. Lemos*,
  832 F.2d 1097 (9th Cir. 1987) .......................................................................................15

*In re California Title Ins. Antitrust Litig.*,
  No. 08-01341 JSW, 2011 WL 2566449 (N.D. Cal. June 27, 2011)..........................................18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 04-1827 SI, 2011 WL 2650689 (N.D. Cal. July 6, 2011) ...................................................20

*Citizens Bank v. Alafabco, Inc.*,
  539 U.S. 52 (2003) ..............................................................................................................9

*Clarium Capital Mgmt. LLC v. Choudhury*,
  No. C 08-5157SBA, 2009 WL 331588 (N.D. Cal. Feb. 11, 2009) .............................14, 15, 18

*Crawford v. Beachbody, LLC*,
  No. 14cv1583-GPC (KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) .............................13

*Eshagh v. Terminix Int'l Co. L.P.*,
  No. 1:11CV0222, 2012 WL 1669416 (E.D. Cal. May 11, 2012) ............................................18

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ...........................................................................................................11

*Fteja v. Facebook, Inc.*,
  841 F.Supp.2d 829 (S.D.N.Y. 2012) ...................................................................................12

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000) ..............................................................................................................9

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002) ............................................................................................................14

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) *cert. denied*,
  *Toyota Motor Corp. v. Choi*, 134 S.Ct. 62 (2013) ...................................................9

*Lopez v. Ace Cash Express, Inc.*,
  No. CV11-04611 JAK, 2012 WL 1655720 (C.D. Cal. May 4, 2012) ....................................18

*Marmet Health Care Ctr., Inc. v. Brown*,
  132 S.Ct. 1201 (2012) .........................................................................9

*Martinez v. Leslie's Poolmart, Inc.*,
  No. 8:14-cv-01481 CAS, 2014 WL 5604974 (C.D. Cal. Nov. 3, 2014) .................................17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ........................................................................9, 20

*Moretti v. Hertz Corp.*,
  No. C 13-02972 JSW, 2014 WL 1410432 (N.D. Cal. Apr. 11, 2014) ...............................11, 12

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
  460 U.S. 1 (1983) *superseded by statute on other grounds* .......................................9

*Murphy v. DIRECTV, Inc.*,
  No. 2:07-cv-06465-JHN-VBx, 2011 WL 3319574 (C.D. Cal. Aug. 2, 2011)
  *aff'd*, 724 F.3d 1218 (9th Cir. 2013) ........................................................21

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ................................................................11

*Nicosia v. Amazon.com, Inc.*,
  No. 14-cv-4513 (SLT)(MDG), 2015 WL 500180 (E.D.N.Y. Feb. 4, 2015) ..............................13

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
  724 F.3d 1069 (9th Cir. 2013) .............................................................14, 15

*Parvataneni v. E*Trade Fin. Corp.*,
  967 F.Supp.2d 1298 (N.D. Cal. 2013) ..........................................................14

*Royer v. Baytech Corp.*,
  No. 3:11-cv-60833-LRH-(WGC), 2012 WL 3231027 (D. Nev. Aug. 3, 2012).........................21

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716, 721 (9th Cir. 1999) .....................................................19, 20, 22

*Starke v. Gilt Groupe, Inc.*,
  No. 13 Civ. 5497 (LLS), 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ..............................13

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*,
  559 U.S. 662 (2010) ........................................................................*passim*

*Swift v. Zynga Game Network, Inc.*,
    805 F.Supp.2d 904 (N.D. Cal. 2011) ........................................................................11, 12, 13

*Tompkins v. 23andMe, Inc.*,
    No. 5:13-cv-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ..........................11, 18

*United States v. Sutcliffe*,
    505 F.3d 944 (9th Cir. 2007) ........................................................................................10

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
    363 U.S. 574 (1960) ........................................................................................................22

*Yahoo! Inc. v. Iversen*,
    836 F.Supp.2d 1007 (N.D. Cal. 2011) ..........................................................................14

**Statutes**

9 U.S.C. § 1 ........................................................................................................................9

9 U.S.C. § 2 ........................................................................................................................9

28 U.S.C. § 1332(d)(1)(D) ..................................................................................................10

**Other Authorities**

American Arbitrational Association Commercial Arbitration Rule 7(a) ..........................15

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Lyft, Inc. ("Lyft") is a peer-to-peer ridesharing platform that connects passengers who need a ride to drivers who have a car and are available to provide rides.  In 2015, Lyft ran a promotion inviting existing Lyft drivers to refer new drivers to use the Lyft platform.  More than 7,000 individuals received bonuses in connection with the promotion, and Lyft has paid over $10 million in bonuses in connection with the promotion.

In fact, the promotion resulted in the biggest wave of driver-applicants in Lyft history.  However, the unprecedented response also brought forth some suspicious applications from individuals who apparently attempted to "game" the system.  For example, some individuals attempted to take advantage of the promotion by shortcutting the training ride process.  Plaintiff Casey Loewen referred numerous applicants, and has already received thousands of dollars in bonuses for referred applicants who successfully applied and qualified for the promotion.  Yet Loewen is suing because he did not receive an extra $1,000 bonus for a referred applicant who submitted an untimely application and did not qualify for the promotion.  Although there are independent problems with Plaintiffs' qualifications for the promotion, for purposes of this motion, the Court does not need to resolve any of these issues.  In order to qualify for the promotion, both new and existing drivers were required to have consented to Lyft's Terms of Service, and every version of those Terms contains a mandatory arbitration provision.

Loewen was an existing Lyft driver who agreed to Lyft's Terms of Service on July 6, 2013.  Those 2013 Terms of Service contain a mandatory arbitration provision that requires the parties to submit "any legal disputes or claims between the Parties" to binding arbitration.  Under the 2013 Terms of Service, questions of arbitrability are reserved for the Court, and under the arbitration provision, Loewen is required to arbitrate his claims against Lyft on an individual, not a classwide, basis.  *See Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 687 (2010) (where an arbitration agreement is silent on the availability of class arbitration, class arbitration is impermissible).

Plaintiff Jonathan Wright was a new Lyft driver-applicant who agreed to Lyft's Terms of Service on February 27, 2015. The 2014 Terms of Service, which Wright agreed to, also contain a mandatory arbitration provision. Unlike the 2013 Terms of Service, the 2014 Terms delegate questions of arbitrability to the arbitrator. But those questions are straight-forward: the Terms require the parties to submit "any legal disputes or claims arising out of or related to the Agreement" to binding arbitration, and the arbitration provision further states that any claim or action must be brought on an individual basis and not as "a class member in any purported class, collective, or representative proceeding."

Despite accepting Lyft's Terms of Service, Plaintiffs ignored the mandatory arbitration provisions. Not only did they file this lawsuit; they purport to have done so as representatives of a putative class. Because the arbitration agreements are valid and enforceable, the Court should grant Lyft's motion and compel arbitration of Plaintiffs' claims on an individual basis.

## II.    FACTUAL BACKGROUND

### A.    Background on the Lyft Platform and Service

Lyft is a mobile-based ridesharing platform (the "Lyft Platform") that enables persons who seek transportation to certain destinations—riders—to be matched with persons driving to or through those destinations—drivers. (Declaration of Sebastian Brannstrom (" Brannstrom Decl."), ¶ 2.) Lyft connects riders and drivers via its mobile-phone application, called the "Lyft App." (*Id.*) When in need of a ride, riders open the Lyft App on their mobile phone and use the Lyft Platform to request a ride from a nearby driver. (*Id.*) Nearby drivers are then informed of the request and can choose whether to accept the request. (*Id.*) The first driver to accept the request is matched with the rider. (*Id.*) The driver then proceeds to pick up and transport the rider to his or her desired destination. (*Id.*)

### B.    Lyft Drivers and Riders Are Required to Consent to Lyft's Terms of Service

In order to use the Lyft App—whether as a rider or a driver—users must agree to Lyft's Terms of Service. (Brannstrom Decl., ¶ 4, Exh. 2.) During the process when a user downloads and attempts to use the Lyft App for the first time, the user is presented with a screen that displays the text of Lyft's Terms of Service:

1

2

3

4

5

6

7

8

9

10

11

12



13  (Brannstrom Decl., ¶ 6)  The user has the opportunity to scroll all the way through the text.  (*Id*.)

14  The user must click "I accept," and agree to the Terms of Service, in order to proceed to use the

15  Lyft App.  (*Id*.)  While users have the option to apply (or not apply) to become a driver through

16  the Lyft App, they cannot become a driver without first downloading the Lyft App and consenting

17  to the Terms of Service.  (*Id*.)

18        In addition, individuals wishing to become Lyft drivers can apply through Lyft's website.

19  (*Id*., ¶ 11.)  In order to apply via the website, users must navigate to the "Drive" page and then fill

20  out a form with basic information including their name, email address, city, phone number, and

21  any referral code they wish to use.  (*Id*., ¶ 11)  On that initial webpage, there is a checkbox that

22  states "I agree to the Lyft terms."  (*Id*.)

23

24

25

26

27

28

1

2

**Apply Now**

3

Enter your info, and then download
the Lyft app to create your driver
profile.

4

5

Last name

6

Email address

7

City

8

Phone number

9

Referral Code (optional)

10

☐ I agree to the Lyft terms

11

**BECOME A DRIVER**

12

Already applied? Check the status of your
application here.

13    "Lyft terms" is a hyperlink that leads to a website containing the terms.  (*Id*.)  Only after the "I

14    agree" box has been checked can prospective drivers submit their application by hitting the

15    "BECOME A DRIVER" button.  (*Id*.)  And if these prospective drivers have not already

16    downloaded the Lyft App itself, they are required to download the Lyft App and consent to the

17    Terms of Service before they can access the Lyft App and use the Lyft Platform as a driver.  (*Id*.)

18         **C.     Both Plaintiffs Agreed to the Terms of Service, Including the Arbitration Clauses**

19         Loewen agreed to the Terms of Service through the Lyft App on July 6, 2013.

20    (Brannstrom Decl., ¶ 8, Exh. 1.)  The version of the Terms of Service in place on that date was the

21    April 30, 2013 Terms of Service (the "2013 TOS").  (*Id*., ¶ 9, Exh. 2.)  Wright agreed to the Terms

22    of Service twice on February 27, 2015, first on the Lyft website and then on the Lyft App.  (*Id*., ¶¶

23    14-15, Exh. 3.)  The version of the Terms of Service in place on that date was the December 22,

24    2014 Terms of Service (the "2014 TOS").  (*Id*., ¶ 16, Exh. 4.)

25         Several aspects of the Terms of Service are relevant to the Court's analysis here.

26         *First*, the Terms of Service advise users that in order to "register for the services provided

27    on Lyft," they must "agree to be bound by the terms and conditions of [the] agreement."  (*Id*., Exh.

28

CALDWELL
LESLIE &
PROCTOR

-4-                                                    Case No. 15-CV-01159-EDL
DEFENDANT'S MOTION TO COMPEL INDIVIDUAL ARBITRATION AND DISMISS ACTION

4 at 2; *see also id*., Exh. 2 at 1-2 (stating that users must accept the Terms of Service "before . . . us[ing] any of the Services").)

*Second*, both the 2013 TOS and 2014 TOS include arbitration provisions.  The 2013 TOS contains the following clause:

### Resolution of Disputes and Legal Claims

> You and We agree that any legal disputes or claims between the Parties that cannot be resolved informally will be submitted to binding arbitration in California.  The arbitration shall be conducted by the American Arbitration Association, or any other established ADR provider mutually agreed upon by the parties.  Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  You agree that in no event shall any claim, action or proceeding by You related in any way to the Lyft Platform and/or the Services (including Your use of the Lyft Platform and/or the Services) be instituted more than three (3) years after the cause of action arose.

(*Id*., Exh. 2  at 12-13.)

The 2014 TOS contains a similar provision:

### Agreement to Arbitrate All Disputes and Legal Claims

> You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules (a copy of which can be obtained here), or as otherwise

1    mutually agreed by you and we. Any judgment on the award rendered

2    by the arbitrator may be entered in any court having jurisdiction

3    thereof.  Claims shall be brought within the time required by

4    applicable law.  You and we agree that any claim, action or

5    proceeding arising out of or related to the Agreement must be brought

6    in your individual capacity, and not as a plaintiff or class member in

7    any purported class, collective, or representative proceeding.  The

8    arbitrator may not consolidate more than one person's claims, and

9    may not otherwise preside over any form of a representative,

10   collective, or class proceeding.  YOU ACKNOWLEDGE AND

11   AGREE THAT YOU AND LYFT ARE EACH WAIVING THE

12   RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A

13   PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS

14   ACTION OR REPRESENTATIVE PROCEEDING.

15   (*Id*., Exh. 4 at 22.)

16       *Third*, other provisions in the Terms of Service clearly encompass aspects of the Lyft

17   Platform raised in this litigation.  The Terms of Service expressly address the issues of background

18   checks, promotions, and email communications.  (*See id*. at 4-5 ("By accepting this Agreement, a

19   Driver agrees that We may obtain information about the Driver, including without limitation the

20   Driver's driving record, references and credit information.  A Driver hereby authorizes Us to

21   perform a background check on Driver, and further agrees to provide any necessary authorization to

22   facilitate Our access to the Driver's official driving record, references and credit information during

23   the term of the Agreement."); *id*. at 8 ("Promotional Offers. Lyft, at its sole discretion, may make

24   available promotional offers with different features to any of our customers."); *id*. at 4 (advising

25   that Lyft may send "[e]-mail communications and text messages . . . designed to make Your Lyft

26   experience more efficient" and that such communications may include "e-mails informing You of

27   promotions"); *id*., Exh. 2 at 3, 4, 8.)

28

### D.   The Promotion

On February 26, 2015, Lyft sent an email regarding a limited-time promotion in certain cities. The email was entitled "Refer a friend. Split $2,000" and was sent to approved Lyft drivers in select markets. (Declaration of Eric Burdullis ("Burdullis Decl."), ¶ 2; Compl. ¶ 15a.) The email announced a limited-time promotion: (1) if a driver referred a friend to apply to become a driver for Lyft; (2) if the friend used the driver's referral code and completed the application process—which includes accepting the Terms of Service, completing a mentor or "welcome" ride, and passing background checks; and (3) if the friend completed their first paid Lyft ride by March 5, the driver and the applicant would both get $1,000 (the "Double-Sided Referral Bonus"). (*Id*.) The email stated that drivers should share the news quickly because background checks take time and applicants need to give a ride by March 5 to qualify for the promotion. (*Id*.)

A similar limited-time promotion was announced in certain cities, but without the double-sided referral requirement: applicants who applied using the referral code BENJAMINS, completed the application process—which includes consenting to the Terms of Service, completing a mentor or "welcome" ride, and passing background checks—and completed their first paid Lyft ride by March 5, would receive $1,000 (the "Single-Sided Bonus"). (Burdullis Decl., ¶ 3; Compl. ¶ 16.) These promotions will be referred to collectively as the "Promotion."

The Promotion resulted in the largest wave of driver-applicants in Lyft history, which overwhelmed Lyft's internal processes. (Burdullis Decl., ¶ 5; Compl. ¶ 21.) In light of the unprecedented response, on February 27, 2015, Lyft announced via email and its webpage that it was no longer accepting new applications for the Promotion. (Burdullis Decl., ¶ 5; Compl., ¶ 18.)

On March 3, 2015, Lyft sent another email to applicants advising them that, while it was continuing to try to process their applications, some applications may not be fully processed in time for the applicants to complete their first ride by March 5 and qualify for the Promotion. (Burdullis Decl., ¶ 6; Compl., ¶ 21.) On March 5, 2015, Lyft provided an update that acknowledged that Lyft underestimated the volume of applications, announced that the March 5th first ride deadline would be extended to March 12th for applicants who passed their background checks by March 5th, and

1   informed applicants that Lyft would not use or benefit from any information supplied by applicants

2   who did not qualify for the Promotion.  (Burdullis Decl. ¶ 7; Compl., ¶ 22.)

3            **E.      Plaintiffs Ignore the Arbitration Provisions and File this Action**

4            Despite agreeing to the mandatory arbitration agreements, on March 11, 2015, Plaintiffs

5   filed the instant action relating to the Promotion.  (*See* Compl. at 1.)

6            Plaintiff Loewen alleges that he has been a Lyft driver since August 2013, and that he

7   received the February 26 "Double-Sided Referral Bonus" email.  (*Id*., ¶¶ 24-25.)  Loewen alleges

8   that he referred Lauren Turton and that Turton completed the driver application on Lyft's website

9   using Loewen's referral code on February 26, 2015.[1]  (*Id*., ¶ 26.)  Plaintiffs allege that Turton was

10   unable to complete her first ride before March 5, because her background check was not completed

11   by that date, and that, as a result, Loewen did not receive the $1,000 bonus.  (*Id*., ¶¶ 28-29.)

12            Plaintiff Wright alleges he applied to become a Lyft driver on February 27, 2015.  (*Id*.,

13   ¶ 31.)  Wright alleges that he applied for the Single-Sided Bonus using the BENJAMINS code.

14   (*Id*.)  Wright alleges that his background check was not completed by March 5, 2015, and that, as

15   a result, he was not granted the extension referred to in the March 5th email.  (*Id*., ¶¶ 33-34.)

16            Plaintiffs assert claims for breach of contract, fraud, and negligent misrepresentation.  (*Id*.,

17   ¶¶ 40-93.)  Plaintiffs allege that Lyft failed to complete the background checks "fast enough to

18   ensure that new drivers would be able to give their first ride by March 5" (*id*., ¶ 20), and

19   misrepresented that "it would only 'take a couple of days' to complete [the] background check,"

20   (*id*., ¶ 59; *see also id*., ¶¶ 42, 47, 51, 67, 74, 81, 88).  Because the Parties have agreed to arbitrate

21   any disputes on an individual, not classwide basis, Lyft brings the instant motion to compel

22   bilateral arbitration.[2]

23

24

---

25   [1]  Turton accepted Lyft's Terms of Service through the Lyft App.  (Brannstrom Decl., ¶ 10.)
     However, Turton's application was untimely and she did not qualify for the Promotion.

26
27   [2]  The phrase "bilateral arbitration" refers to individual, as opposed to classwide, arbitration.  *See*
     *Stolt-Nielsen S.A*., 559 U.S. at 686-87 (contrasting "bilateral" arbitration, where an arbitrator
     resolves "a single dispute between the parties," with "class-action arbitration," where an arbitrator
28   would resolve "disputes between hundreds or perhaps thousands of parties").

III.    **PLAINTIFFS SHOULD BE COMPELLED TO ARBITRATE THEIR DISPUTE WITH LYFT ON AN INDIVIDUAL BASIS**

Congress enacted the Federal Arbitration Act ("FAA") to reverse the "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011). The Supreme Court has repeatedly emphasized that courts are obligated to enforce arbitration agreements as written because the FAA "'reflects an emphatic federal policy in favor of arbitral dispute resolution.'" *See, e.g., Marmet Health Care Ctr., Inc. v. Brown*, 132 S.Ct. 1201, 1203 (2012) (quoting *KPMG LLP v. Cocchi*, 132 S.Ct. 23, 25 (2011), and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA allows courts to enforce arbitration agreements through "an affirmative order to engage in arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 22 (1983) *superseded by statute on other grounds*; *see also* 9 U.S.C. § 4. Thus, under the FAA, a court must compel arbitration if it finds that: (1) the transaction involves interstate commerce; (2) a written arbitration agreement exists between the parties; and (3) the dispute falls within the scope of the agreement. *See Mitsubishi*, 473 U.S. at 626-28.

Given the strong federal policy in favor of arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25. The party opposing enforcement of the arbitration agreement bears the heavy burden of proving that the claims are not subject to arbitration. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000).

A.    *Lyft's Terms of Service Involve Interstate Commerce*

The FAA "governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) *cert. denied, Toyota Motor Corp. v. Choi*, 134 S.Ct. 62 (2013); *see* 9 U.S.C. §§ 1, 2 (FAA applies to "a contract evidencing a transaction involving commerce"); *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (under the FAA, "involving commerce" signals "the broadest permissible exercise

of Congress' Commerce Clause power").  Here, the contracts and transactions at issue easily satisfy the "involving interstate commerce" requirement.

To qualify for the Promotion, all users were required to have agreed to the Terms of Service.  (Brannstrom Decl., ¶¶ 4, 6, 8, 11, 13.)  Both the 2013 TOS and the 2014 TOS are written contracts that provide a license to use the Lyft platform.  (Brannstrom Decl., Exh. 2 at 1.)  The Lyft platform uses the Internet to transmit requests from riders across a network of independent drivers in a number of different states, and all transactions are processed electronically.  (*Id*., ¶ 2.)  As Plaintiffs allege:  the Lyft platform "facilitates peer-to-peer ridesharing through [a] mobile-phone application by connecting passengers who need a ride to drivers who have a car."  (Compl., ¶ 11.)  Because the Lyft Terms of Service cover the use of an Internet application that impacts interstate commerce, the FAA should apply here.  *See United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("the Internet is an instrumentality and channel of interstate commerce") (internal quotation marks omitted).

The involvement of interstate commerce is further confirmed by the fact that Lyft's service is available in almost thirty states including Arizona, California, Colorado, Florida, Georgia, New York, Washington, Texas, and Tennessee.  (Brannstrom Decl., ¶ 3.)  While Lyft is based in California, the Promotion at issue in the Complaint was allegedly available in "Atlanta, Austin, Boston, Chicago, Dallas, Denver, Los Angeles, Miami, Nashville, Philadelphia, San Diego, San Francisco, San Jose, Seattle, and Washington D.C."  (Compl., ¶ 13; *see also id*., ¶ 15 (alleging Lyft communicated the programs in the participating cities and on its website).)  The use of the Lyft Platform to facilitate a promotion in various cities in different states undoubtedly involves interstate commerce.  Indeed, the Plaintiffs' ability to invoke this Court's subject matter jurisdiction is based on the fact that the Promotion implicated interstate commerce.  *See* 28 U.S.C. § 1332(d)(1)(D).

## B.   *Plaintiffs Loewen and Wright Each Agreed to Arbitration When They Agreed to Lyft's Terms of Service*

Where there is an agreement to arbitrate, the Court must compel arbitration because "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  *Concepcion*, 131 S.Ct. at 1745 (internal citations omitted).  In

determining whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Here, the Lyft Terms of Service are "governed by the laws of the State of California."  (Brannstrom Decl., Exh. 4 at 24.)

Applying California law, courts routinely uphold the enforceability of so-called "clickwrap agreements"—online agreements where users are required to click an "I agree" box assenting to terms of service—even where those terms are presented by hyperlink.  *See Tompkins v. 23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752, at **7-9 (N.D. Cal. June 25, 2014) (compelling arbitration where "each named Plaintiff clicked a box or button that appeared near a hyperlink to the TOS to indicate acceptance of the TOS" containing the arbitration provision); *Moretti v. Hertz Corp.*, No. C 13-02972 JSW, 2014 WL 1410432, at *3 (N.D. Cal. Apr. 11, 2014) (holding that plaintiff assented to forum selection clause in Hotwire's terms and conditions where plaintiff was required to click an acceptance box acknowledging Hotwire's terms and conditions next to a hyperlink to those terms); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (distinguishing "browsewrap" and "clickwrap" agreements, and acknowledging general enforceability of agreements "where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website").

Here, Wright and Loewen each expressly agreed to arbitration by affirmatively assenting to Lyft's Terms of Service.

### 1.    Loewen consented to arbitration by agreeing to the 2013 TOS

On July 6, 2013, Loewen agreed to arbitration when he downloaded the Lyft App, affirmatively assented to the operative 2013 TOS through a "clickwrap" process, and applied to be a Lyft driver.  As part of his driver-application process, Loewen was presented with the text of the Terms of Service and could not have proceeded with signing up to be a Lyft driver without first assenting to the 2013 TOS.  (*See* Sections II.B & C, *supra*; *see also Swift v. Zynga Game Network, Inc.*, 805 F.Supp.2d 904, 910 (N.D. Cal. 2011) (describing "clickwrap" process).)

In order to use the Lyft App, Loewen was required to click through a short series of steps and he was prompted to review and electronically accept Lyft's Terms of Service.  (Brannstrom

Decl., ¶¶ 4, 6 8.)  Loewen was informed that he "must read, agree with and accept all of the terms and conditions contained in th[at] Agreement" before using any of Lyft's services.  (*Id.*, Exh. 4, ¶ 9, Exh. 2.)  And Loewen accepted the Terms of Service.  (*Id.*, ¶ 8, Exh. 1.)  He has been using the Lyft App since that time pursuant to the Terms.

The Terms of Service that Loewen accepted contained several headings in conspicuous enlarged type, including the "Resolution of Disputes and Legal Claims."  (*Id.*, Exh. 2 at 12-13.) Under that heading, the Terms of Service explicitly state that "You and We agree that any legal disputes or claims between the Parties that cannot be resolved informally will be submitted to binding arbitration in California."  (*Id.* at 13.)  Loewen was presented with the Terms of Service and, by checking "I agree" and proceeding with his driver application, he agreed to the Terms of Service, including the requirement to arbitrate.  *See Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 837 (S.D.N.Y. 2012) (explaining that "clickwrap" agreements "have been routinely upheld by circuit and district courts") (internal quotation marks and citation omitted).

### 2.   Wright consented to arbitration by agreeing to the 2014 TOS

Similarly, Wright agreed to arbitration by affirmatively assenting to the 2014 TOS twice on February 27, 2015:  first through a "clickwrap" or "modified clickwrap" process when he applied to be a Lyft driver through the Lyft website; and again through the same "clickwrap" process as Loewen did, by assenting to the 2014 TOS through the Lyft App.  (*See* Brannstrom Decl., ¶¶ 14-15, Exh. 3.)  Under very similar circumstances, this Court compelled arbitration in *Swift*, 805 F.Supp.2d at 904.

In *Swift*, this Court held that the plaintiff assented to the TOS and its arbitration provision by clicking an "Accept" or "Allow" button, where there was a hyperlink to the TOS immediately under the button.  *Id.* at 911-12.  This Court concluded that "clickwrap presentations providing a user with access to the terms of service and requiring a user to affirmatively accept the terms, even if the terms are not presented on the same page as the acceptance button, are sufficient" to bind a plaintiff to an arbitration clause in those terms of service.  *Id.* (labeling this process a "modified clickwrap").

*Swift* is consistent with other decisions from this Court like *Tomkins* and *Moretti*, as well as with decisions from around the country, that have routinely enforced arbitration clauses in

1   online agreements.  *See, e.g.*, *Crawford v. Beachbody, LLC*, No. 14cv1583-GPC (KSC), 2014 WL

2   6606563, at *3 (S.D. Cal. Nov. 5, 2014) (enforcing online arbitration provision); *Nicosia v.*

3   *Amazon.com, Inc.*, No. 14-cv-4513 (SLT)(MDG), 2015 WL 500180, at **5-7 (E.D.N.Y. Feb. 4,

4   2015) (enforcing arbitration provision where online Amazon purchaser was bound by conditions

5   of use when website stated that, "'By placing your order, you agree to Amazon.com's privacy

6   notice and conditions of use,'" which were hyperlinked on the same webpage) (citation omitted);

7   *Starke v. Gilt Groupe, Inc.*, No. 13 Civ. 5497 (LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24,

8   2014) (enforcing arbitration clause in hyperlinked Terms of Use).

9        Here, as in *Swift* and the myriad of other cases enforcing online arbitration agreements, the

10   online Lyft driver application provided Wright with notice of the Terms of Service and the

11   requirement to arbitrate, and Wright affirmatively assented to those terms.  (*See* Sections II.B & C,

12   *supra*.)  On the very first page of the online application, Wright checked a box next to the words "I

13   agree to the Lyft Terms."  (Brannstrom Decl., ¶¶ 11-14.)  The words "I agree to the" were in grey

14   text, and the words "Lyft Terms" were conspicuously in pink and provided a hyperlink to the

15   Terms of Service.  (*Id.*, ¶ 11, Exh. 4.)  Wright could not proceed with his application without

16   affirmatively checking the box indicating that he accepted these Terms of Service.  (*Id.*, ¶¶ 11, 14.)

17   Wright also accepted the Terms of Service through the Lyft App on February 27, 2015.  (*Id.*, ¶ 15,

18   Exh. 3.)  Therefore, Wright did in fact assent to the Terms of Service.  (*Id.*, ¶¶ 14-16, Exhs. 3-4.)

19        The Terms of Service that Wright electronically accepted contain several large, bold

20   headings that direct the reader to important provisions, including the "Agreement to Arbitrate All

21   Disputes and Legal Claims."  (Brannstrom Decl., Exh. 4 at 22.)  There are no hidden terms in

22   smaller print or in any separate document or hyperlink.  To the contrary, the Terms of Service

23   conspicuously provide, in all capital letters, "YOU ACKNOWLEDGE AND AGREE THAT

24   YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY."  (*Id.*)  These

25   Terms of Service were immediately available to Wright, and by electronically consenting and

26   proceeding with his driver application, he agreed to the Terms of Service, including the

27   requirement to arbitrate.

28

**C.**      ***Plaintiffs' Claims Are Within the Scope of the Arbitration Clauses And***

***Individual Arbitration Is Required***

Because both Wright and Loewen assented to Lyft's Terms of Service and its arbitration clauses, the Court must address: (1) whether the Court or arbitrator decides questions of arbitrability; and (2) if questions of arbitrability fall within the province of the Court, whether (a) the dispute falls within the scope of the arbitration clause, and (b) classwide arbitration is permissible. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (characterizing "'question of arbitrability'" as "question [of] whether the parties have submitted a particular dispute to arbitration") (citation omitted); *Parvataneni v. E*Trade Fin. Corp.*, 967 F.Supp.2d 1298, 1303-04 (N.D. Cal. 2013) (characterizing the question of whether classwide arbitration is permitted as a question of "arbitrability"); *Yahoo! Inc. v. Iversen*, 836 F.Supp.2d 1007, 1011 (N.D. Cal. 2011) (same).

Here, the 2013 TOS and 2014 TOS treat differently the threshold issue of who decides arbitrability. Under the 2013 TOS, questions of arbitrability are reserved for the Court. In contrast, under the 2014 TOS, arbitrability questions are expressly delegated to the arbitrator. Regardless of who decides, the result is the same: the dispute falls clearly within the scope of the arbitration provisions and classwide arbitration is not available under either version of the Terms of Service.

**1.      Questions of arbitrability are treated differently under the 2013 TOS and the 2014 TOS**

Questions of arbitrability are ordinarily for the court to decide. *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013). However, when the parties "clearly and unmistakably" demonstrate an intent to have the arbitrator decide issues of arbitrability, those issues should be referred to the arbitrator. *Id.* In those circumstances, the court's inquiry is limited to whether the assertion of arbitrability is "wholly groundless." *Clarium Capital Mgmt. LLC v. Choudhury*, No. C 08-5157SBA, 2009 WL 331588, at *5 (N.D. Cal. Feb. 11, 2009).

Here, the 2013 TOS is silent as to who decides questions of arbitrability, and therefore those issues are decided by the Court. *See Oracle*, 724 F.3d at 1072. By contrast, the 2014

TOS expressly refers issues of arbitrability to the arbitrator.  (Brannstrom Decl., Exh. 4 at 22 ("You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the . . .  arbitrability of any dispute) . . . shall be submitted to binding arbitration . . . .").)  The intent in the 2014 TOS to refer issues of arbitrability to the arbitrator is further confirmed by its express incorporation of the AAA rules.[3]  (*See id.*, Exh. 4 at 22 ("The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules . . . .").)  Indeed, numerous courts have held that when an arbitration agreement explicitly incorporates rules that empower an arbitrator to decide issues of arbitrability, like the AAA rules, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate those issues to an arbitrator.  *See, e.g.*, *Oracle*, 724 F.3d at 1074 (UNCITRAL rules); *Clarium*, 2009 WL 331588, at *5 (AAA rules).  Moreover, as explained below, the Parties' dispute is well within the scope of the arbitration clause; the assertion of arbitrability is certainly not "wholly groundless." *Clarium*, 2009 WL 331588, at *5.

Accordingly, the Court should:  (a) decide questions of arbitrability under the 2013 TOS; and (b) delegate questions of arbitrability under the 2014 TOS to the arbitrator.

**2.      Under the 2013 TOS, Loewen's claims should be sent to individual arbitration**

**(a)      Loewen's claims fall within the scope of the 2013 TOS**

The 2013 TOS—the TOS to which Loewen initially assented—provides for the arbitration of "any legal disputes or claims between the Parties."  (Brannstrom Decl., Exh. 2 at 13.)  This language is broad and clearly encompasses Loewen's contract and tort claims.  *See, e.g.*, *C.D. Anderson & Co. v. Lemos*, 832 F.2d 1097, 1099 (9th Cir. 1987) (holding that because plaintiff "signed a contract requiring 'any dispute . . . between the parties to be arbitrated[]' [and] [t]he dispute was submitted to arbitration pursuant to that clause[,] [t]he district court . . . did not err in concluding that the securities law and RICO claims were submitted"); *Athena Feminine Techs. Inc.*

---

[3]  AAA Commercial Arbitration Rule 7(a) provides:  "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

1   *v. Wilkes*, No. C 10-04868 SBA, 2011 WL 4079927, at *11 (N.D. Cal. Sept. 13, 2011) (holding

2   that "arbitration clause [that] expressly state[d] that '[a]ll disputes' between the parties are subject

3   to arbitration . . . requir[ed] the parties to submit all disputes between them to an arbitrator")

4   (citation omitted).  In addition, as discussed below, Loewen may not arbitrate those claims on a

5   classwide basis.

6               **(b)         The 2013 TOS requires Loewen to proceed with individual**

7                             **arbitration**

8               The 2013 TOS is silent on the issue of classwide arbitration, and the lack of affirmative

9   consent to classwide arbitration requires Loewen to proceed with bilateral (or non-class) arbitration.

10  As the Supreme Court has reiterated on multiple occasions, an arbitration agreement that is "silent

11  on the question of class procedures" cannot be interpreted to allow class arbitration because the

12  "'changes brought about by the shift from bilateral arbitration to class-action arbitration' are

13  'fundamental.'"  *Concepcion*, 131 S.Ct. at 1750 (quoting *Stolt-Nielsen*, 559 U.S. at 686).

14              It is a "basic precept" of "fundamental importance" that "arbitration 'is a matter of consent,

15  not coercion.'"  *Stolt-Nielsen*, 559 U.S. at 681 (citation omitted).  "[T]he central or 'primary'

16  purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to

17  their terms.'"  *Id*. at 682 (citation omitted).  "[P]arties may specify *with whom* they choose to

18  arbitrate their disputes."  *Id*. at 683 (emphasis in original).  Therefore, "a party may not be

19  compelled under the FAA to submit to class arbitration unless there is a contractual basis for

20  concluding that the party *agreed* to do so."  *Id*. at 684 (emphasis in original).  In *Stolt-Nielsen*, the

21  Supreme Court explained that an agreement to arbitrate is not an "implicit agreement to authorize

22  class-action arbitration," and therefore held that where an agreement is silent on class arbitration,

23  class arbitration is impermissible.  *Id*. at 685, 687.[4]

24

25  [4] In *Stolt-Nielsen*, the Supreme Court further explained the many fundamental differences between
    individual and class arbitration that make it impermissible to infer an agreement to arbitrate on a
26  classwide basis.  *Id*. at 686-87 (concluding that "the differences between bilateral and class-action
    arbitration are too great . . . to presume . . . that the parties' mere silence on the issue of class-
27  action arbitration constitutes consent to resolve their disputes in class proceedings" and noting that
    "the relative benefits of class-action arbitration" such as lower costs, greater efficiency and speed
28

1    Here, the 2013 TOS does not provide for class arbitration:

2    > You and We agree that any legal disputes or claims between the

3    > Parties that cannot be resolved informally will be submitted to

4    > binding arbitration in California.  The arbitration shall be conducted

5    > by the American Arbitration Association, or any other established

6    > ADR provider mutually agreed upon by the parties.  Any judgment

7    > on the award rendered by the arbitrator may be entered in any court

8    > having jurisdiction thereof.

9    (Brannstrom Decl., Exh. 2 at 13.)  Nothing in the agreement indicates that Lyft and Loewen

10   authorized class arbitration.  To the contrary, the 2013 TOS makes clear that "You and We"—

11   Loewen and Lyft—are the specific parties who agreed to arbitrate their disputes.  (*Id*.)  It is

12   apparent that the agreement contemplated informal resolution of claims and that "any []

13   established" alternative dispute resolution provider could conduct the arbitration with the parties'

14   consent.  The agreement does not provide for any class procedures.

15   This conclusion is also supported by the fact that, although Lyft's 2013 TOS mentions the

16   American Arbitration Association ("AAA"), it declines to state that the parties will proceed under

17   the AAA Rules, or even to require that the parties use AAA.  (*See* Brannstrom Decl., Exh. 2.)  In

18   these circumstances, courts in this district and the other district courts in California have uniformly

19   held that class arbitration is unavailable.  For example, in *Parvataneni*, the arbitration agreement

20   similarly provided that "'[t]he arbitration will be conducted by the American Arbitration

21   Association'" but did not incorporate the AAA rules.  967 F.Supp.2d at 1300 (citation omitted).

22   The court held that "the arbitration agreement [did] not provide for collective arbitration."  *Id*. at

23   1303.  In reaching this conclusion, the court found it significant that the parties did not explicitly

24   agree "to be bound by the rules of the American Arbitration Association."  *Id*.; *accord Martinez v.*

25   *Leslie's Poolmart, Inc*., No. 8:14-cv-01481 CAS (CWx), 2014 WL 5604974, at **3-4 (C.D. Cal.

26   ──────────────
     "are much less assured," the arbitrator "no longer resolves a single dispute between the parties to a

27   single agreement, but instead resolves many disputes between hundreds or perhaps even thousands
     of parties," and the "award no longer purports to bind just the parties to a single arbitration

28   agreement, but adjudicates the rights of absent parties as well").

Nov. 3, 2014) (compelling individual arbitration, holding that the agreement was "silent regarding arbitration of class claims," and rejecting plaintiff's argument that an agreement that "refers to JAMS and AAA" shows that the parties contemplated class arbitration); *Tompkins*, 2014 WL 2903752, at **10-11 (holding that an arbitration provision that "refers to the 'rules and auspices of the American Arbitration Association'" did not incorporate the AAA Rules). The 2013 TOS's failure to incorporate the AAA Rules similarly supports the conclusion that the parties did not agree to class arbitration.[5]

Thus, according the 2013 TOS and the *Stolt-Nielsen* line of precedent, the Court should compel Loewen to arbitrate his claims on a bilateral, not classwide, basis.[6]

### 3. Under the 2014 TOS, Wright's claims should be sent to individual arbitration

As discussed above, the 2014 TOS—the TOS to which Wright assented—delegates questions of arbitrability to the arbitrator. (*See* Section III.C.2.1.) The Court's role is limited to adjudicating whether the assertion of arbitrability is "wholly groundless." *Clarium*, 2009 WL 331588, at *5. Here, the assertion of bilateral arbitration is not "wholly groundless." To the

---

[5] Even if the 2013 TOS had incorporated the AAA rules, given that it was otherwise silent on the issue of class arbitration, such incorporation would not be sufficient to show an agreement to arbitrate on a classwide basis. *See Lopez v. Ace Cash Express, Inc.*, No. CV11-04611 JAK (JCx), 2012 WL 1655720, at **1, 8 (C.D. Cal. May 4, 2012) (compelling individual arbitration and holding that, even where agreement expressly incorporated the AAA Rules, the agreement was "silent on class-wide arbitration"); *Eshagh v. Terminix Int'l Co. L.P.*, No. 1:11CV0222 (AWI DLB, 2012 WL 1669416, at **3, 9-10 (E.D. Cal. May 11, 2012) (recommending that class claims be struck pursuant to *Stolt-Nielsen*, even where parties agreed that AAA Commercial Arbitration Rules governed); *In re California Title Ins. Antitrust Litig.*, No. 08-01341 JSW, 2011 WL 2566449, at **3-4 (N.D. Cal. June 27, 2011) (plaintiffs conceded that "arbitration agreements are silent as to class-action waivers," even where explicitly governed by AAA Rules).

[6] Lyft believes that Loewen is also subject to individual arbitration under the 2014 TOS, based on Lyft's reservation of the right to modify the Terms and Loewen's continued use of the Lyft Platform up to and through the effective date of the 2014 TOS. (*See* Brannstrom Decl., Exh. 2 at 2 ("IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, PLEASE DO NOT USE OR ACCESS LYFT OR REGISTER FOR THE SERVICES PROVIDED ON LYFT. We may amend this Agreement at any time by posting the amended terms on the Lyft Platform. If We post amended terms on the Lyft Platform, You may not use the Services without accepting them.").) However, the Court need not reach this issue because Loewen was already compelled to participate in individual arbitration under the 2013 TOS.

1   contrary, because Wright's claims fall well within the scope of the 2014 TOS, and those terms

2   include a class action waiver, even if the Court were to determine that arbitrability under the 2014

3   TOS is for the Court to decide, it should still order Wright to bilateral arbitration.

4                      **(a)      Wright's claims fall within the scope of the 2014 TOS**

5              The 2014 TOS includes a broad delegation to arbitration:

6                      *[A]ny legal disputes or claims arising out of or related to the*

7                      *Agreement* (including but not limited to the use of the Lyft Platform

8                      and/or the Services, or the interpretation, enforceability, revocability,

9                      or validity of the Agreement, or the arbitrability of any dispute), that

10                     cannot be resolved informally shall be submitted to binding arbitration

11                     in the state in which the Agreement was performed.

12  (Brannstrom Decl., Ex. 4 at 22) (emphasis added).  The 2014 TOS broadly defines the "Lyft

13  Platform" as the "application owned and operated by Lyft Inc." that "enables persons who seek

14  transportation to certain destinations ("Riders") to be matched with persons driving to or through

15  those destinations ("Drivers")."  (*Id*. at 1-2.)

16             As explained by the Ninth Circuit in *Simula, Inc*. *v*. *Autoliv, Inc*., such language reaches

17  any dispute that *touches a matter* covered by the contract:

18                     Every court that has construed the phrase "arising in connection with"

19                     in an arbitration clause has interpreted that language broadly. . . .

20                                              ***

21                     To require arbitration, [the plaintiff's] factual allegations need only

22                     "touch matters" covered by the contract containing the arbitration

23                     clause and all doubts are to be resolved in favor of arbitrability.

24  175 F.3d 716, 721 (9th Cir. 1999); *see also Mitsubishi*, 473 U.S. at 624 n.13 (holding that where

25  arbitration clause provided for the arbitration of "[a]ll disputes, controversies or differences which

26  may arise between [Mitsubishi] and [Soler] out of or in relation to [the specified provisions] or for

27  the breach thereof," the plaintiff was required to arbitrate any claim that "touch[ed] matters

28  covered by the enumerated articles") (alterations in original).

Courts interpreting *Simula* and *Mitsubishi* have similarly emphasized that arbitration clauses that, like the clause in the 2014 TOS, contain the phrase "'related to' must be read broadly" and encompass "matters that, while not arising directly under the contractual relationship, are nevertheless related to it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 04-1827 SI, 2011 WL 2650689, at *5 (N.D. Cal. July 6, 2011); *see also Athena*, 2011 WL 4079927, at *12 (holding dispute touched arbitration clause contained in a separate agreement that was executed after the relevant contract, because the relevant contract was "intertwined" with the parties' business relationship).

Here, the Terms of Service is a license to use the Lyft Platform.  (Brannstrom Decl., Exhs. 2 at 1, 4 at 1.)  Plaintiffs complain that the Promotion was designed to sign up new drivers to the Lyft Platform, that class members were wrongly delayed in their applications to become drivers on the Lyft Platform, and that class members would have been entitled to thousands of dollars in bonuses had they successfully signed up to drive on the Lyft Platform.  (*See, e.g.*, Compl., ¶¶ 23, 42, 43, 47, 48, 91.)  Class members, including Loewen and Wright, could not participate in and qualify for the Promotion (*e.g.*, receiving the original promotional email, submitting to the approval process, and being matched for their qualifying ride) without the Lyft Platform. (Brannstrom Decl., ¶¶ 2, 4, 6, 8, 11, 13; *id.*, Exh. 2 at 3, 8.)  In other words, the core of the allegations is inextricably intertwined with "the Lyft Platform and/or the Services" at the heart of Terms of Service, which contains the arbitration clause.

In addition, Plaintiffs' factual allegations touch the Terms of Service because the wrongdoing alleged in the Complaint involves matters that are specifically addressed by provisions in the Terms of Service.  Plaintiffs allege that the Promotion was initially communicated to them via e-mail and on Lyft's website, and that subsequent communications regarding the Promotion occurred via e-mail.  (*See* Compl., ¶¶ 15, 18, 21, 22, 34.)  The gravamen of Plaintiffs' Complaint is that Lyft failed to timely perform background checks and that, as a result, Plaintiffs were unable to complete their first ride and receive the bonus purportedly promised by the Promotion.  (*See, e.g.*, *id.*, ¶¶ 13, 15, 20.)  In fact, Lyft's alleged failures and misrepresentations with respect to the background check process form the basis for each of Plaintiffs' eight causes of action, and

1    Plaintiffs use the date upon which individuals' background checks were completed to define their

2    proposed classes.  (*See id*., ¶¶ 36, 42, 47, 51, 59, 67, 74, 81, 88.)

3           Thus, critical to Wright's claims of wrongdoing are the subjects of background checks,

4    promotions, and e-mail communications.  Each of these subjects is *expressly* addressed by the

5    Terms of Service.  For example, the issue of background checks is specifically addressed under

6    the heading "Your Information."  (*See* Brannstrom Decl., Exh. 4 at 7-8).  In this section, users are

7    informed that a background check is required and are advised that assenting to the Terms of

8    Service constitutes authorization for Lyft to initiate the check.  (*Id*.)  The Terms of Service also

9    include sections addressing "Promotional Offers" and "E-Mail and Text Communications."  (*Id*.,

10   Exh. 4 at 4, 14.)  Notably, it was the latter section that specifically authorized Lyft to send the

11   initial email to its drivers advertising the Promotion.  (*Id*., Exh. 4 at 14 (authorizing Lyft to send

12   "e-mails informing [users] of promotions").)  Accordingly, Wright's allegations of wrong-doing

13   *directly raise*, and certainly "touch," matters addressed by the Terms of Service.  *See Murphy v.*

14   *DIRECTV, Inc*., No. 2:07-cv-06465-JHN-VBx, 2011 WL 3319574, at *4 (C.D. Cal. Aug. 2, 2011)

15   *aff'd*, 724 F.3d 1218 (9th Cir. 2013) (holding that plaintiffs' claims alleging that defendant's

16   packaging led them to believe they were purchasing DirecTV receivers and DVRs, when in fact

17   they were leasing them, sufficiently touched matters covered by a customer agreement that

18   discussed leased equipment); *Royer v. Baytech Corp*., No. 3:11-cv-60833-LRH-(WGC), 2012 WL

19   3231027, at *6 (D. Nev. Aug. 3, 2012) (holding that, although "Plaintiffs' Breach of NRS Chapter

20   608 claim [did] not directly reference the Purchase Agreement or Employment Agreements," it

21   "touch[ed] matters" contained in those agreements because "the statute and the claim deal directly

22   with the pay owed to Plaintiffs, which is covered under the Employment Agreements").

23          Furthermore, acceptance of the Terms of Service was a prerequisite to become a driver

24   under the Promotion; new drivers who applied for the Promotion had to accept the Terms of

25   Service before giving their qualifying rides, either when they first joined the Lyft Platform as a

26   rider or, for those applicants who had not previously been riders, when they applied for the

27   Promotion.  (*See* Brannstrom Decl., ¶¶ 4, 6, 8, 11, 13.)  Thus, acceptance of the Terms of Service

28   was a *requirement* to successfully participate in the Promotion.  The 2014 TOS, which Wright

agreed to in order to become a driver, and his allegations regarding the Promotion to become a driver, are therefore intertwined.

For the reasons set forth above, the crux of the complaint and its factual allegations "touch matters" and are therefore "related to" the Terms of Service. *Mitsubishi*, 473 U.S. at 624 n.13; *Simula*, 175 F.3d at 721. Accordingly, Wright's claims are well within the scope of the arbitration clause in the 2014 TOS. Even if there were room for doubt, any doubts "should be resolved in favor of arbitration." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960) ("an order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute"); *see Mitsubishi*, 473 U.S. at 626 ("'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'") (citation omitted).

### (b)    The 2014 TOS requires Wright to proceed with individual arbitration

It is well-settled that the Court must enforce the parties' arbitration agreement as written, including an agreement that the arbitration proceed on an individual and non-class basis. *See, e.g.*, *Concepcion*, 131 S.Ct. at 1748; *accord Stolt-Nielsen*, 559 U.S. at 683. In *Concepcion*, the Supreme Court held that the FAA preempted a state rule that precluded enforcement of class action waivers in arbitration agreements. 131 S.Ct. at 1748, 1753. "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *Id.* at 1748 (alterations in original and citation omitted). The Supreme Court reasoned that "[r]equiring the availability of classwide arbitration," contrary to the parties' agreement, "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.*

The Supreme Court recently reaffirmed the rule that "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes.'" *American Exp. Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2309 (2013) (citations omitted, alterations in original). In *Italian Colors*, the Supreme Court overturned a Second Circuit rule that allowed courts to reject class action waivers in arbitration agreements if the plaintiff would incur prohibitive costs to arbitrate an individual case.

1   *Id.* at 2312.  The Court held that the "FAA does not sanction" any such basis for refusing to

2   enforce an arbitration agreement's class action waiver.  *Id.* at 2312 & 2319 n.5.

3         The 2014 TOS unambiguously states that "any claim, action or proceeding arising out of or

4   related to the Agreement must be brought in your individual capacity, and not as a plaintiff or

5   class member in any purported class, collective, or representative proceeding." (*See* Brannstrom

6   Decl., Exh. 4 at 22.)  Further, "[t]he arbitrator may not consolidate more than one person's claims,

7   and may not otherwise preside over any form of a representative, collective, or class proceeding."

8   (*Id.*)  Finally, the arbitration agreement states in all capital letters:  "YOU ACKNOWLEDGE

9   AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY

10  JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED

11  CLASS ACTION OR REPRESENTATIVE PROCEEDING." (*Id.*)

12        Because the arbitration provision in Lyft's 2014 TOS clearly requires arbitration of all of

13  Wright's claims, but expressly prohibits arbitration of those claims on a classwide or

14  representative basis, Wright must also arbitrate his claims on an individual, non-class basis.

15  Indeed, refusing to enforce the class action waiver here would fail to effectuate the parties'

16  agreement for the "speedy resolution that . . . bilateral arbitration in particular was meant to

17  secure." *Italian Colors*, 133 S.Ct. at 2312.

18  **IV.   CONCLUSION**

19        For the foregoing reasons, Lyft respectfully requests dismissal with prejudice of the

20  putative class action claims of Plaintiffs Casey Loewen and Jonathan Wright and in favor of

21  arbitration proceedings on an individual basis, or, in the alternative, for a stay of their claims

22  pending the completion of individual arbitration proceedings.

23  DATED:  April 17, 2015            CALDWELL LESLIE & PROCTOR, PC
                                      CHRISTOPHER G. CALDWELL

24                                        MICHAEL D. ROTH

25                                        ALBERT GIANG
                                      CAMERON J. JOHNSON

26

27                  By         /s/
                          CHRISTOPHER G. CALDWELL

28                   Attorneys for Defendant LYFT, INC.